## 𝔚𝔶𝔱𝔥𝔢𝔳𝔦𝔩𝔩𝔢.

### DUNCAN V. CARSON.

### June 10, 1920.

1. PLEADING—*Notice of Motion for Judgment—General Issue—Grounds of Defense.*—There is in strictness no such pleading as a general issue to a notice, but the courts accept it as a general denial of the plaintiff's claim set up in the notice, and, like other general issues, it may be pleaded orally; but all other defenses must be set up in writing. Such other defenses to a motion may be set up by a mere statement of the grounds of defense in writing.

2. NOTICE OF MOTION FOR JUDGMENT—*Procedure Viewed With Liberality—Grounds of Defense.*—The procedure by notice of motion for judgment is viewed with great liberality. When the grounds of defense have been set up in writing, without formal plea, the parties are generally deemed to be at issue upon the grounds so stated, without the necessity for a replication, or other pleading.

3. NOTICE OF MOTION FOR JUDGMENT ON NOTES—*Special Plea—Waiver of Other Grounds of Defense.*—In a proceeding by notice of motion for judgment on notes, a special plea setting up the breach of a collateral agreement is not a waiver of other grounds of defense, for a defendant may plead as many matters of law or fact as he may think necessary, and he is not required to file all of his pleas in bar at the same time.

4. NOTICE OF MOTION FOR JUDGMENT—*Return of Notice.*—Section 3211 of the Code of 1904 requires that the notice shall be returned to the clerk's office within five days after service, but it does not require the clerk to indorse on the notice the date of filing.

5. NOTICE OF MOTION FOR JUDGMENT—*Return—Case at Bar.*—A motion was made to dismiss the instant case on the ground that the notice was not returned to the clerk's office within five days. The deputy sheriff who served the notice was examined as a witness in the case, and the trial judge was of opinion that it sufficiently appeared that the notice had been duly returned, and hence overruled the motion.

*Held:* That under the evidence, there was no error in this ruling.

6. SUBPOENA DUCES TECUM—*Examination of Books and Papers—Appeal and Error—Harmless Error—Case at Bar.*—In a proceeding by motion for judgment on certain notes a *subpoena duces tecum* was issue for the plaintiff, the president of the corporation, in payment for whose stock the notes were given, to produce certain books and papers of the company, and in the same subpoena he was summoned to testify on behalf of the defendant. In response to the subpoena, plaintiff appeared with the books and papers. The defendant asked liberty to examine the books and papers, but objection was made unless plaintiff was first sworn as a witness, and the objection was sustained.

   *Held:* In view of the limited extent of the cross-examination to which plaintiff would have been subjected, and as the trial court offered to give counsel for the defendant time and opportunity to examine the books after the swearing of the plaintiff, the defendant could not have been hurt by the ruling requiring plaintiff to be sworn, and the ruling was harmless error.

7. PRODUCTION OF DOCUMENTS—*Identifying Documents Produced.*—When books and papers are produced upon a *subpoena duces tecum* and are admitted to be the books and papers called for by the subpoena, there is no occasion to swear the witness producing them to identify them; but, if such admission is not made, it is necessary in some way to identify them. This may be done by swearing the witness who produces the books, or any other witness who knows the facts.

8. SUBPOENA DUCES TECUM—*Ad Testificandum Clause.*—The *subpoena duces tecum* usually also contains the *ad testificandum* clause, but this is not at all necessary. The two clauses have separate and distinct objects, and either may be enforced without the other; and, even where both clauses are contained in the same subpoena, it is not necessary for the party suing out the writ to avail himself of both objects.

9. SUBPOENA DUCES TECUM—*Witness Sworn for the Purpose of Identifying Books—Cross-Examination.*—The swearing of a witness producing books and papers on a *subpoena duces tecum* for the purpose of identifying the books, so that they may be used as evidence, does not make him a witness for the party calling him, so as to subject him to cross-examination by the opposing party as to any other matters.

10. WITNESSES—*Limit of Cross-Examination.*—The cross-examination of witnesses is limited to matters brought out on the examination in chief.

11. PLEADING—*Statement of Grounds of Defense—Waiver of Provisions of Section 6091 of the Code of 1919.*—The object and effect of section 3249 of the Code of 1904, section 6091 of the Code of 1919, permitting a plaintiff to call upon the defendant for a statement of his grounds of defense, was to limit the scope and operation of the general issue, and to confine the introduction of evidence to the particular defenses disclosed by the statement. The statute, however, was not enacted to punish the defendant, but to protect the plaintiff against surprise at the trial, and hence its provisions may be waived by the plaintiff if he chooses to do so.

12. PLEADING—*Grounds of Defense—Waiver of Section 6091 of the Code of 1919.*—If evidence admissible under the general issue, but not under the grounds of defense, is offered and received without objection, and there is no motion to strike it out, objection to its admissibility is thereby waived, and it may be considered by the jury. Objection to its admissibility cannot be made for the first time in the Supreme Court of Appeals.

13. PLEADING—*Grounds of Defense—Waiver of Section 6091 of the Code of 1919—Case at Bar.*—In the instant case, a motion for judgment on notes, the so-called general issue put in issue the liability of the defendant on the notes in suit, and evidence of the fraud alleged to have been perpetrated on the defendant by misreading the notes to him was admissible thereunder, as there was no objection thereto when it was offered, nor any motion made thereafter to strike it out. Nor was it mentioned in the statement of the grounds of demurrer. It was proper, therefore, for the court to consider it on the demurrer to the evidence.

14. DEMURRER TO THE EVIDENCE—*General Rule.*—On a demurrer to the evidence, the demurrant is considered as admitting the truth of all his adversary's evidence and all just inferences that can be properly drawn therefrom by the jury, and as waiving all his own evidence which conflicts with that of his adversary, or which has been impeached, and all inferences from his own evidence (although not in conflict with his adversary's) which do not *necessarily* result therefrom. This admission embraces the credibility of the demurree's witnesses and the existence of all facts which demurree's evidence (which includes testimony) conduces to prove, or which may be reasonably inferred from his whole evidence, direct and circumstantial; and, if several inferences may be drawn from that evidence, differing in degrees of probability, the court must adopt those most favorable to the demurree, provided they be not forced, strained, or manifestly repugnant to reason.

15. DEMURRER TO THE EVIDENCE—*Limitation of the Rule.*—On a demurrer to the evidence the court is not obliged to accept as true what it knows judicially to be untrue, nor what in the nature of things could not have occurred in the manner and under the circumstances mentioned, nor what is not susceptible of proof.

16. BILLS, NOTES AND CHECKS—*Fraud in Procurement—Misreading Note to Maker—Bona Fide Holder—Case at Bar.*—The agents of a corporation who sold the stock of the corporation to the defendant for which the notes sued upon were given, told defendant that if he would subscribe for the stock, the company would give him a repurchase agreement by which the stock was to be repurchased within eleven months, and would take his notes for the stock payable at twelve months after date. Defendant agreed to take the stock upon these terms, but as he could not read without his glasses, the agents undertook to fill the blanks in the notes in suit in accordance with the agreement, and then read them to defendant as payable twelve months after date, and he thereupon signed them, supposing them to be payable twelve months after date, whereas in fact, they were made payable six months after date.

    *Held:* That the difference in the due date of the notes was a very material departure from the agreement actually made, and that whether the notes were void or voidable, a holder of the notes could not recover unless he showed that he obtained them *bona fide* for value in the usual course of business, before maturity, and under circumstances which created no presumption that he knew of the facts which impeached their validity.

17. PLEA—*Admission in Plea Contradicted by Defendant's Evidence.*—In an action upon notes defendant in a special plea admitted that the notes were payable at six months, but upon his examination as a witness testified that the notes were payable at twelve months, plaintiff contended that in view of the conflict between the statement of the plea and defendant's testimony he should be held to the statement in his plea. It must be borne in mind, however, that the plea was prepared by counsel, and it was for the jury to determine which was correct, and if the jury making inferences most favorable to the defendant, might have found in favor of the testimony of defendant, it was the duty of the trial court, on the demurrer to the evidence by the plaintiff, to have so decided.

18. BILLS, NOTES AND CHECKS—*Fraud—Bona Fide Holder—Burden of Proof—Credibility of Witnesses.*—In an action upon notes, where fraud in their procurement is established, the burden

is upon the plaintiff to show that he, or some other person under whom he claims, acquired the title as a holder in due course, and the credibility of plaintiff's testimony on this point, though undisputed, is for the jury.

19. CORPORATIONS—*Agent to Sell Stock—Authority.*—Where the general sales manager of the stock of a corporation had no superior in the department of sales, the jury might well have believed that a sale of stock of the corporation by him to the defendant on time was binding on the corporation. If so, defendant had the right to set up the defense growing out of an agreement to repurchase the stock from him eleven months from date.

20. OFFICERS AND AGENTS OF PRIVATE CORPORATIONS—*Acceptance by Corporation of Benefit of Contract Made by Agent.*—If a corporation accepts the benefit of a contract made by its agent, it is bound by the representations of its agent, although unauthorized.

21. OFFICERS AND AGENTS OF PRIVATE CORPORATIONS—*President.*—It is the duty of the president of a corporation, when he signs a certificate of stock, to know that the conditions have been complied with which authorize the issue of the stock.

22. BILLS, NOTES AND CHECKS—*Bona Fide Holder—President of Corporation—Case at Bar.*—The sales manager of a corporation sold certain stock of the corporation to defendant and entered into an agreement with him to repurchase the stock in eleven months time, taking defendant's notes payable in twelve months, as defendant thought, for the purchase price of the stock. The notes, however, were really payable in six months. The sales manager then sold the notes to the president of the corporation, who brought suit upon them against defendant.

*Held:* That when the stock certificate was issued to defendant, the company had the right to demand the surrender of the notes given by defendant for the stock, and the jury might well have believed that the transaction between the sales manager and the president stood on no higher footing than if the notes of defendant had been transferred to the president by the company. If the notes had been transferred to the president by the company, he could not have set up the defense of a *bona fide* holder in due course, as he was the president of the company.

23. APPEAL AND ERROR—*Judgment by Appellate Court.*—Where, upon the reversal of a judgment of the lower court, the facts before the Supreme Court of Appeals are such as to enable it to attain the ends of justice, it will, in pursuance of section

6365 of the Code of .1919, enter a final judgment in favor of the plaintiff in error.

*On a Petition for Rehearing, Richmond, November 18, 1920.*

24.  Nunc Pro Tunc Orders—*General Issue—Case at Bar.*—A petition for rehearing alleged that the court erred in affirming a *nunc pro tunc* order of the lower court, under which a plea of the general issue was entered after the case had been fully tried and judgment entered for the plaintiff—neither the plaintiff nor his counsel having any intimation, during the trial, that the general issue was relied upon by the defendant thus rendering testimony competent which under the actual pleadings was incompetent.

   *Held:* Under the facts established by the record, that the plaintiff had notice in ample time to have withdrawn his demurrer to the evidence if he had desired so to do, and having failed to do so, he could not be heard to say that he was taken by surprise or injured by the effect of his voluntary inaction in the premises. The fact that counsel had no notice till after verdict of the jury was wholly immaterial.

25.  Nunc Pro Tunc Orders—*Object of Orders—Case at Bar.*—The object of a *nunc pro tunc* order is to make the record show something which actually took place at a former day of the court. It is not to permit something to be done which was omitted by oversight or otherwise. So, in the instant case, when the *nunc pro tunc* order states that the general issue was pleaded at the April term of the court, it is an indisputable fact that it was so pleaded.

26.  Pleading—*Pleas—Notice of Plea.*—A defendant is not required to give notice of the time and place of filing his pleas.

27.  Appea   and Error—*General Objection to Evidence—Case at Bar.*—A general objection to testimony is properly overruled if the testimony is admissible on any ground. In the instant case, one objection was made to certain parol evidence on the ground that it would contradict a writing, and a general objection was also made to the evidence assigning no ground. But no objection was made to the evidence on the ground that it was not within the pleadings.

   *Held:* That as the evidence was admissible under the general issue, and no valid objection was offered to it, objection to its admissibility under the grounds of defense was waived.

28.  Appeal and Error—*Judgment of Appellate Court—Section 6365, Code of 1919.*—Section 6365 of the Code of 1919 relates entirely

to procedure in the appellate court, and was in force when the opinion in the instant case was rendered. It does not confer any original jurisdiction upon the court, and none was exercised by the court in the instant case. Its enactment was clearly within the legislative power.

Error to a judgment of the Circuit Court of Culpeper county, in a proceeding by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*Hiden & Bickers* and *S. M. Nottingham,* for the plaintiff in error.

*F. T. Sutton, Jr.,* and *J. Kent Rawley,* for the defendant in error.

BURKS, J., delivered the opinion of the court.

This was a proceeding by motion for a judgment on three negotiable notes aggregating $5,000, made by E. P. Duncan and held by J. Preston Carson. The notes were not paid at maturity, and Carson brought this motion and obtained the judgment to which this writ of error was awarded.

At the hearing the plaintiff called upon the defendant for a statement of his grounds of defense, which were furnished in writing. Two days later the defendant filed a special plea, setting up the breach of the collateral agreement hereinafter set forth for the repurchase of the stock at an advance, within eleven months. This plea does not allege that any of the statements made to the defendant as to the value of the stock were false. The allegation of the plea is, "and at the same time made various statements

as to value of said stock to your defendant." Neither does the plea allege any promise made by the corporation. After setting forth various facts, the plea concludes that by reason of the failure of Marion Allen, fiscal agent of the corporation and of Seals, to keep their various promises, and agreements, "he has suffered damage to the extent of $6,-125.00," which remains due and unpaid. There is no allegation anywhere in the plea that the defendant did not sign the notes, or that they were read to him differently from what they state on their face, or that they were payable at twelve instead of six months. There is no allegation of fraud in the *factum* of the notes, but simply that they were procured by false representations of agents of the company.

At the July term of the court, after the verdict of the jury had been rendered, and while the case was being argued on the demurrer of the plaintiff to the defendant's evidence, the court entered a *nunc pro tunc* order showing that the general issue had been pleaded orally at the previous April term of the court. The parties went to trial on the issues made by these pleadings.

[1, 2] There is in strictness no such pleading as a general issue to a notice, but the courts accept it as a general denial of the plaintiff's claim set up in the notice, and, like other general issues, it may be pleaded orally, but all other defenses must be set up in writing. Such other defenses to a motion may be set up by a mere statement of the grounds of defense in writing. *Preston v. Salem Imp. Co.,* 91 Va. 583, 22 S. E. 486, 1 Va. Law Reg. 447, and note. The procedure is viewed with great liberality. When the grounds of defense have been set up in writing, without formal plea, the parties are generally deemed to be at issue upon the grounds so stated, without the necessity for a replication, or other pleading.

[3-5] The filing of the special plea was not a waiver of

other grounds of defense, as claimed by the plaintiff, for a defendant may plead as many several matters of law or fact as he may think necessary, and he is not required to file all of his pleas in bar at the same time. Sec. 3264, Code 1904.

Section 3211 of the Code of 1904, under which this proceeding was had, requires that the notice shall be returned to the clerk's office within five days after service, but it does not require the clerk to endorse on the notice the date of filing. A motion was made to dismiss this action on the ground that the notice was not returned to the clerk's office within such five days. The deputy sheriff who served the notice was examined as a witness in the case, and the trial judge was of opinion that it sufficiently appeared that the notice had been duly returned, and hence overruled the motion. It would serve no useful purpose to recite the testimony, but we are of opinion that there was no error in his ruling. *New River Min. Co. v. Roanoke C. & C. Co.*, 110 Fed. 343, 49 C. C. A. 78; Burks Pl. & Pr., sec. 96.

The parties then proceeded to trial of the case on its merits. The plaintiff offered in evidence the notes in controversy and rested his case. Thereupon, the defendant offered evidence in support of his defense, and the plaintiff offered evidence in rebuttal. After all the evidence was in, the plaintiff demurred to the defendant's evidence, and the trial court sustained the demurrer and entered the judgment complained of. The case made by the demurrer to the evidence is as follows: E. P. Duncan is a farmer residing in Culpeper county, Virginia, and is worth upwards of a hundred thousand dollars. For ten years he had been a director in a local national bank. In September, 1917, Marion Allen was the fiscal agent and general manager of sales of the stock of the Carson Manufacturing Corporation, which was engaged in the manufacture and sale of "kickless" cranks for motor vehicles. In these capacities he dealt with Duncan in the transactions hereinafter set

forth. On September 5, 1917, Marion Allen, in company with Pope Seals, who was a subordinate, employed by him, went to the house of Duncan in Culpeper county to sell him stock in the Carson Manufacturing Corporation. Duncan, who is the only witness examined in his behalf on this subject, describes what took place there at the time as follows:

"Q. What statements, if any, were made to you by Allen and Seals which induced you to execute and deliver said notes which are in action?

"The Witness: They came over to my house and they were there, I suppose, two or three hours. I told them time and again that I had no money to take no notes or to buy any stock. They finally told me that if I would take this stock the company would give me eleven months, or they would discount the—take the—would give me $5,625 or $5,650, I have forgotten which, for the stock, in order to take up the notes with. The notes were given for twelve months. And I then took the stock. I think the notes were given for twelve months were they not?

"The Court: Just answer the question according to your recollection.

"The Witness: That is my recollection, that they were given for twelve months."

On further examination he testified that he could not read writing without his glasses, and that the notes in suit were made out by Allen and were read to him by Allen as payable twelve months after date: that he also signed, without reading, an application for the purchase of 250 shares of stock in said company; that Allen gave him a receipt for $5,000, and that there was endorsed on the receipt an agreement to repurchase the stock at $5,625, and that he received from the company a certificate for the 250 shares of stock. All of these papers were filed as parts of the

record. The application for the stock stated, "I agree that no promise or statement made by the agent taking this application or any other person shall be binding beyond the printed terms of this application." The endorsement on the receipt was as follows:

"We hereby agree and bind ourselves to pay E. P. Duncan $5,625.00 in cash for 250 shares of capital stock of Carson Mfg. Corp. within eleven (11) months from date, if he so desires." This agreement was dated "9/5/17," and was signed, "Marion Allen, Genl. Mgr. of Sales. Pope Seals."

[6-10] Neither Duncan nor any other witness testified to any representation whatever made to Duncan by either Allen or Seals as to the value of the stock sold. No enquiry seems to have been made by Duncan on the subject, nor any information given by Allen, Seals or anyone else. The record is simply silent on that subject. Allen, however, does testify that at the time of the sale to Duncan the stock was worth $20 per share.

A number of subordinate questions of interest were raised and discussed, both orally and in the briefs, but it will be necessary to decide only a few of them. A *subpoena duces tecum* was issued for the plaintiff, J. P. Carson, as president of the Carson Manufacturing Corporation, to produce certain books and papers of the company, and in the same subpoena he was summoned to testify on behalf of the defendant. This was in conformity with the usual practice in this State. In response to the subpoena Carson appeared with the books and papers. The defendant asked liberty to examine the books and papers, but objection was made unless Carson was first sworn as a witness, and the objection was sustained, and this ruling of the trial court is assigned as error. When the objection was sustained, the trial judge stated to counsel for the defendant, "that after the witness is sworn, and the books are produced by

the witness, they will have an opportunity to examine them and decide whether or not they choose to put them in." If when the books and papers were produced they were admitted by the plaintiff to be the books and papers called for by the subpoena, then there was no occasion to swear the witness to identify them, but, if the admission was not made, it was necessary in some way to identify them. This might have been done by swearing the witness who produced the books, or any other witness who knew the facts. The *subpoena duces tecum* usually also contains the *ad testificandum* clause, but this is not at all necessary. The two clauses have separate and distinct objects, and either may be enforced without the other; and even where both clauses are contained in the same subpoena, it is not necessary for the party suing out the writ to avail himself of both objects. If it were, a designing party might place the books in the custody of a hostile individual for the purpose of compelling the opposite party to call him as his own witness. It does not follow that, because a witness is sworn simply to identify books, he is called to give evidence generally in the cause. *Summers* v. *Mosely,* 2 Cr. & M. 447; *Perry* v. *Gibson,* 1 A. & E. 48; Chamberlayne on Ev., sec. 3615; 3 Wigmore on Ev., sec. 2200; Jones on Ev., sec. 802. In *Wilson* v. *United States,* 221 U. S. 361, 31 Sup. Ct. 538, 55 L. Ed. 771, it was held that the *ad testificandum* clause was not essential to the validity of a *subpoena duces tecum* and that where the subpoena also contained the *ad testificandum* clause it was not necessary to have the party producing the books sworn as a witness, but that they might be proved by others. But the swearing of Carson, in the case at bar, simply for the purpose of identifying the books, so that they might be used as evidence, would not have made him the defendant's witness for the purpose of general cross-examination as to his knowledge of the facts of the case. Even under the English rule, where the right of

cross-examination extends far beyond what is allowed by us, a witness called to produce a document to be identified or proved by another witness is not subject to cross-examination by the opposing party. Jones on Ev., sec. 802. Under what is termed the American rule, which prevails in this State, the cross-examination of witnesses is limited to matters brought out on the examination in chief. *Wills* v. *Russell,* 100 U. S. 621, 625, 25 L. Ed. 607; *Miller* v. *Miller,* 92 Va. 510, 516, 23 S. E. 891; Jones on Ev., sec. 820. If, therefore, Carson had been sworn simply to identify the books he could not have been properly cross-examined as to any other matter. He would not have been thereby made the witness of the defendant except for the purpose of proving the books. In view of the limited extent of the cross-examination, and as the trial court offered to give counsel for the defendant time and opportunity to examine the books after the swearing of Carson, the defendant could not have been hurt by the ruling requiring Carson to be sworn, and the ruling was harmless error.

The effect of failure to introduce the books after examining them presents a question upon which the authorities are in conflict, but which need not be here considered because the books were not examined by the defendant.

It has been argued before us that the misreading of the time of payment of the notes to Duncan by Allen constituted fraud in the execution of the notes rendering them void in the hands of every holder, whether in due course or not, and that therefore Duncan is not bound for their payment, but it is objected that no such issue was within the pleadings.

[11-13] The defendant was called upon for, and stated, his grounds of defense under the provisions of section 3249 of Code 1904, now section 6091 of Code 1919. The object and effect of this section was to limit the scope and operation of the general issue, and to confine the introduction of

evidence to the particular defenses disclosed by the statement. *Oeters* v. *Knights of Honor*, 98 Va. 201, 35 S. E. 356. The statute, however, was not enacted to punish the defendant, but to protect the plaintiff against surprise at the trial, and hence its provisions may be waived by the plaintiff if he chooses to do so. *City Gas Co.* v. *Poudre*, 113 Va. 224, 74 S. E. 158. If the evidence admissible under the general issue, but not under the grounds of defense, is offered and received without objection, and there is no motion to strike it out, objection to its admissibility is thereby waived, and it may be considered by the jury. Objection to its admissibility cannot be made for the first time in this court. In the case at bar, the so-called general issue put in issue the liability of the defendant on the notes in suit, and evidence of the fraud alleged to have been perpetrated on the defendant by misreading the notes to him was admissible thereunder, as there was no objection thereto when it was offered, nor any motion made thereafter to strike it out. Nor was it mentioned in the statement on the grounds of demurrer. It was proper, therefore, for the court to consider it on the demurrer to the evidence.

[14, 15] Before reverting to the testimony of the defendant it is necessary, in view of the argument of counsel, to restate some of the familiar law applicable to demurrers to the evidence. On a demurrer to the evidence, the demurrant is considered as admitting the truth of all his adversary's evidence and all just inferences that can be properly drawn therefrom by the jury, and as waiving all his own evidence which conflicts with that of his adversary or which has been impeached, and all inferences from his own evidence (although not in conflict with his adversary's) which do not *necessarily* result therefrom. This admission embraces the credibility of the demurree's witnesses and the existence of all facts which demurree's evidence (which

includes testimony) conduces to prove, or which may be reasonably inferred from his whole evidence, direct and circumstantial; and, if several inferences 'may be drawn from that evidence, differing in degrees of probability, the court must adopt those most favorable to the demurree, provided they be not forced, strained, or manifestly repugnant to reason. The court, however, is not obliged to accept as true what it knows judicially to be untrue, nor what in the nature of things could not have occurred in the manner and under the circumstances mentioned, nor what is not susceptible of proof. *Horner* v. *Speed*, 2 Pat. & H. 616; *Mangum* v. *Norfolk & W. R. Co.*, 125 Va. 244, 99 S. E. 686, 5 A. L. R. 346; Burks' Pl. & Pr., sec. 261, and cases cited; *Tutt* v. *Slaughter*, 5 Gratt. (46 Va.) 364.

[16] The evidence for the defendant proved or conduced to prove the following facts, which must be accepted as facts for the purposes of this case, under the rule obtaining on a demurrer to the evidence: The agents of the company who sold the stock to Duncan told him if he would subscribe for $5,000 of the stock, the company would give him the repurchase agreement hereinbefore set forth, by which the stock was to be repurchased within eleven months from that time at $5,625, and would take his notes for the stock payable at twelve months after date; that he thereupon agreed to take the stock upon these terms, but that he could not read without his glasses, and the agents undertook to fill the blanks in the notes in suit in accordance with the agreement, and then read them to him as payable twelve months after date, and he thereupon signed them, supposing them to be payable twelve months after date.

The difference in the due date of the notes was a very material departure from the agreement actually made, as, under the latter, Duncan's notes would not mature until one month after the expiration of his right to demand the repurchase, whereas, if the notes were payable six months

after date, they would mature five months before he could demand the repurchase.

Whether, upon these facts, the notes in suit are void or voidable presents a question upon which the authorities are in conflict (Bishop on Contracts (ed. 1887), secs, 645-649; 8 Corpus Juris, 790; Clark on Contracts (2d ed.) 197; 14 Am. & Eng. Encl. Law (2d ed.) 157; *Biddeford Nat. Bk.* v. *Hill,* 102 Me. 346, 66 Atl. 721, 120 Am. St. Rep. 499; *Griffiths* v. *Kellogg,* 39 Wis. 290, 20 Am. Rep. 48, and cases cited; *Briggs* v. *Ewart,* 51 Mo. 245, 11 Am. Rep. 445; *Walker* v. *Egbert,* 29 Wis. 194, 9 Am. Rep. 548; *Williams* v. *Hamilton,* 104 Iowa 423, 73 N. W. 1029, 65 Am. St. Rep. 475; *El Dorado Jewelry Co.* v. *Darnell,* 135 Ia. 555, 113 N. W. 344, 124 Am. St. Rep. 309, and note; *contra,* cases cited in notes Bishop on Contracts, sec. 649; Clark on Contracts (2d ed.) 234; 6 R. C. L. 52; 14 Am. & Eng. Ency. L. (2d ed.) 157) ; but which it is unnecessary for us to decide because even if the notes are only voidable, we are of opinion that Carson cannot recover on them.

In *Piedmont Bank* v. *Hatcher,* 94 Va. 229, 26 S. E. 505, it was held that if the maker of a negotiable note, or other party primarily bound for its payment, or bound by the original consideration, proves that it was obtained by fraud or illegality in its inception, or if the circumstances' raise a strong suspicion of fraud or illegality, the holder of the note must show that he obtained it *bona fide* for value in the usual course of business, before maturity, and under circumstances which create no presumption that he knew of the facts which impeached its validity.

The case cited arose before the adoption of the negotiable instruments act (laws 1898, c. 866), which went into effect July 1, 1898. But the decision is in accord with section 59 of that act, now section 5621 of the Code (1919), which declares: "Every holder is deemed *prima facie* to be a holder in due course, but when it is shown that the

title of any person who has negotiated the instrument was. defective, the burden is on the holder to prove that he or some person under whom he claims, acquired the title as a holder in due course. But the last mentioned rule does not apply in favor of the party who became bound on the instrument prior to the acquisition of said defective title."

Duncan testified positively that his notes were to run twelve months, that they were filled in by the agents and read to him as twelve months, when in fact they were made payable at six months.

[17, 18] It is objected that Duncan's special plea, sworn to by him, admits that the notes were payable at six months, and that in view of the conflict between the statements of the plea and his testimony he should be held to the statement in his plea. But it must be borne in mind that the plea was prepared by counsel, and it was for the jury to determine which was correct, and if the jury, making inferences most favorable to the defendant, might have found in favor of the testimony of Duncan, it was the duty of the trial court, on the demurrer to the evidence, to have so decided. It must be accepted, therefore, that at least fraud in the procurement of the contract was established by the testimony of Duncan. This threw upon Carson the burden of showing that "he or some person under whom he claims acquired the title as a holder in due course." This he attempted to do by his own testimony and that of Allen, the agent who made the sale. The credibility of this testimony, though undisputed, was for the jury. *Joy* v. *Diefendorf*, 130 N. Y. 6, 28 N. E. 602, 27 Am. St. Rep. 484. Allen's account of this part of the transaction is that he was connected with the company from its organization as its fiscal agent and general manager of sales of its stock; that he had no superior in this department, not even the president of the company, but that he was himself "the superior in the department of sales;" that before making the sale to

Duncan he was assured by the cashier of one of the national banks in Culpeper that he felt no hesitancy in saying that his finance committee would discount Duncan's notes for at least $5,000. He also had the same verbal assurance from the cashier of another bank; that after making the sale to Duncan he applied to the two banks to discount the notes of Duncan, but each refused, solely on the ground that they had already discounted his paper to their limit; that he was personally able to pay the $5,000 himself, but wished to get the money on the notes and turn the cash in to the company, and applied to one man in Richmond to take them, but he had been unable to do so because he could not furnish the cash, but only a time certificate of deposit; that Carson, the plaintiff in the case, was the president of the company, and that he and Carson had a suite of offices in a building in the city of Richmond; that the company had offices and he had a private office in connection with the suite; that he had no authority to execute the contract of repurchase on behalf of the company, and did not execute on its behalf, but on behalf of himself; that while he had made a number of these contracts of repurchase, the contract in suit was the only one to which he signed his name as general manager of sales; that having made the sale, he had either to turn in the money to the treasury for the stock, or else replace the stock in the treasury of the company; that not desiring to advance the cash himself, he applied to Carson to sell him 250 shares of stock in exchange for Duncan's notes. At the time he made the offer he showed to Carson a letter from the cashier of the Culpeper National Bank as to Duncan's worth, and that Carson gave him the 250 shares of stock in exchange for the Duncan notes, and that he returned the 250 shares of stock to the treasurer of the company, thereby making the company whole. He says that he does not think he told Carson anything about his habit of mak-

ing repurchase agreements, and that Carson knew nothing about such agreements as they were individual matters, and he had nothing to do with them. He appears to have had entire control of the sales with authority to direct when stock should be issued, and he testifies, "I authorized the secretary of the company to issue the stock and forward it to Mr. Duncan, which was done. Then after I could not convert the notes into cash and the stock had been issued from the treasury after I could not convert these notes into cash, and not feeling disposed to put up the cash myself, I sold the notes to Mr. Carson in order to reimburse the treasury of the Carson Manufacturing Company in the transaction;" and that Carson turned the stock over to him which he replaced in the treasury of the corporation. The certificate of stock which was issued to Duncan was signed by Carson as president of the company. Carson testifies that he sold the stock to Allen after seeing the letter from the cashier of the Culpeper National Bank and the application of Duncan for the purchase of the stock, and that he had no knowledge of the repurchase agreement or of any matter affecting the validity of the notes.

[19, 20] As Allen was the general sales manager of the stock of the company and had no superior in the department of sales, the jury might well have believed that the sale to Duncan on time was binding on the company. If so, Duncan had the right to set up the defense growing out of the repurchasing agreement. If the company accepted the benefit of the contract, it was also bound by the representations of its agent, although unauthorized. *Owens* v. *Boyd Land Co.*, 95 Va. 560, 28 S. E. 950.

[21, 22] It was also the duty of Carson, as president of the company, when he signed the certificate of stock to Duncan, to know that the conditions had been complied with which authorized the issue of the stock, and if he failed

to do so, he was negligent. If Allen had no authority to sell except for cash, then when he found he could not perfect the transaction he should have disclosed the facts to the officers of the company, notified Duncan, and asked a return of the stock upon the surrender of his notes. In selling the stock he was acting as agent for the company, and he, of course, knew if the notes were turned in to the company, and the company was the holder of them, Duncan could set up in a suit brought by the company the breach of the collateral agreement set forth in the special plea. When the stock certificate was issued to Duncan, the company had the right to demand the surrender of the notes given by Duncan for the stock, and the jury might well have believed that the transaction between Allen and Carson stood on no higher footing than if the notes of Duncan had been transferred to Carson by the company. If the jury might have so found, the trial court, on the demurrer to the evidence, should have so decided. If the notes had been transferred to Carson by the company, he could not have set up the defense of a *bona fide* holder in due course, as he was the president of the company. *McCarty* v. *Kepreta,* 24 N. D., 395, 139 N. W., 992, 48 L. R. A. (N. S.) 76, Ann. Cas. 1915 a, 834; *Caraker* v. *Hix,* 9 Ga. App. 493, 71 S. E. 765; *Hardin* v. *Dale,* 45 Okl. 694, 146 Pac. 717, L. R. A. 1915 D, 1099; Moss Banks & Banking, sec. 137.

Upon the evidence in this cause, the jury might have well believed that Carson did not obtain the notes "under circumstances which created no presumption that he knew the facts which impeached their validity," and that he had not borne the burden thrown upon him by the statute.

There was a verdict in favor of Duncan against Carson for $362.50, in the event the demurrer to the evidence should be overruled, but there was no evidence to sustain it and it will be set aside. Upon entry of the final judgment

in this court, Carson, the defendant in error, will be entitled to demand of and recover from Duncan, the plaintiff in error, possession of the certificate for 250 shares of stock of the Carson Manufacturing Company.

It is unnecessary to discuss other assignments of error.

[23]    For the reasons stated, we are of opinion that the trial court erred in sustaining the demurrer of the defendant in error to the evidence of the plaintiff in error, and for this reason its judgment must be reversed and the verdict of the jury will be set aside; and as the facts before this court "are such as to enable it to attain the ends of justice," it will, in pursuance of section 6365 of the Code, enter a final judgment in favor of the plaintiff in error, and for his costs in this court and also in the circuit court.

*Reversed.*

*On a Petition for Rehearing, Richmond, November* 18, 1920.

PER CURIAM:

This case was very carefully considered on the original hearing, and, while some of the points were close and difficult, the result was the deliberate judgment of the court. A petition for rehearing has been filed in which counsel for the petitioner earnestly insist that the court has erred, both in its statement of the facts of the case, and in its conclusions of law, and we are asked "to lay aside the many technicalities of rule and reason which play so prominent a part in arriving at its conclusions," and to "*consider upon its merits* the only evidence of fraud brought out by the defendant."

The prime object of litigation is to do justice between the parties. But this object is to be attained subject to

such rules and regulations as have been found essential to the due and orderly administration of justice and the attainment of right ends in the great majority of cases. Absolute justice in every case is unattainable in human courts, and if the "technicalities of rule and *reason*" shall in exceptional cases bear hardly upon a litigant, it is a part of the price he has to pay for being a member of organized society. We have said this much on the subject simply in reply to the language of the petition, but we find nothing exceptional in this case. Neither do we find that the court has erred to the prejudice of the petitioner as to its statement of facts or its conclusions of law.

The petition for rehearing sets up only two grounds of error not considered in the opinion on the original hearing. They are—

[24] 1. "In affirming a *nunc pro tunc* order of the lower court, under which a plea of the general issue was entered after the case had *been fully tried* and judgment entered for the plaintiff—neither the plaintiff nor his counsel having any intimation, during the trial, that the general issue was relied upon by the defendant.

"The effect of this retroactive order was to render testimony competent which, under the actual pleadings, was wholly incompetent."

2. That the construction placed upon section 6365 of the Code makes that section act retroactively, contrary to settled legal principles, and that the judgment entered by this court was in the exercise of original and not appellate jurisdiction, contrary to section 88 of the Constitution.

[25] We shall deal with these in their order. Before considering the orders made in the cause, it must be recalled that the object of a *nunc pro tunc* order is to make the record show something which actually took place at a former day of the court, but which the record does not disclose. It is not to permit something to be done which

was omitted, by oversight or otherwise, but to show what was in fact done, and to cause the record to speak when it was previously silent. When it thus speaks, it is record evidence of the fact stated and is indisputable. So, in the case in judgment, when the *nunc pro tunc* order states that the general issue was pleaded at the April term of the court, it is an indisputable fact that it was so pleaded.

The ordinary practice on a demurrer to the evidence is for the jury to render their verdict, and for the demurrer to the evidence to be argued at the same term at which the verdict is rendered, while the evidence is fresh in the minds of the court and counsel, and the court either decides the demurrer then or takes time to consider of its judgment. Of course, there are cases where the argument on the demurrer is deferred to a later time, but such cases are by agreement of counsel with the assent of the court. But there is nothing in the record to show any such agreement, or assent. The order of July 18, 1918, recites the tender of the demurrer to the evidence and the joinder therein, and the verdict of the jury, and the order then concluded, "Whereupon the court takes time to consider of its judgment on the said demurrer to the evidence, and this case is continued to the next regular term of this court." The order of November 2nd simply says that "the court having heard the argument of counsel upon the demurrer" to the evidence, doth decide, etc. There is nothing in the latter order to show when the argument was heard, whether at that term or at some previous day, and the language of the order is exactly what it would have been had the argument been at the July term. The record does not show that the argument was at the November term. On the contrary, it rather indicates that the hearing was at the July term, as it is not to be supposed that the court, in a hotly contested case, would take the case under consideration before the argument of counsel on the demurrer was

heard.   The language of the opinion of the court on that subject is well warranted by the record.

[26] It is stated in the opinion that the *nunc pro tunc* order was entered while the case was being argued on the demurrer.   This was error, but immaterial and harmless, as the order of November 2nd shows that the petitioner "tendered the affidavits of F. T. Sutton, Jr., and J. Kent Rawley that no notice of the tender of such plea or the entry thereof was had by them until after the verdict of the jury and the case *was being argued on demurrer to the evidence*." (Italics supplied.)   A defendant is not required to give notice of the time and place of filing his pleas, but, waiving this suggestion, the plaintiff had notice in ample time to have withdrawn his demurrer to the evidence if he had desired so to do, and having failed to do so, he cannot now be heard to say that he was taken by surprise or injured by the effect of his voluntary inaction in the premises.   The fact that counsel had no notice till after verdict of the jury was wholly immaterial.   On a demurrer to the evidence the jury do not pass on the merits of the case at all, nor on the liability of the parties, but only fix the amount of the damages, subject to the opinion of the court on the question of liability.

The whole defense on the subject of fraud in the procurement of the contract was set forth in the written grounds of defense of the defendant, which were filed in the papers in the cause May 17, 1918, and are as follows:

"(1) That in order to obtain the said notes from the said defendant there was executed and delivered to him before the delivery of said notes a written contract whereby it was agreed that the said stock would be taken off his hands within eleven months from the date thereof, paying him therefor the sum of $5,625.00, on which said contract the said defendant relied, was material to his subscription and was the inducement therefor.   That the said contract

was made for the sole purpose of deceiving and defrauding the said defendant; that neither the said plaintiff, the Carson Manufacturing Company, of which he is president, nor the agents thereof, ever intended to comply with said contract, are not able to do so, and will never comply therewith; that they have been repeatedly called upon by the said defendant to fulfil the same, and have refused to carry out the same.

"(2)    That there was no *consideration* of value given to the said defendant for the said notes.

"(3)    That the said notes sued on were obtained from the said defendant by fraud, deception and misrepresentations, which were believed and relied on by the said defendant.

"(4)    That the said defendant was induced to execute and deliver said notes by false, fraudulent, misleading and deceptive representations and statements made to him at the time of the execution of said notes for the purpose of securing the said notes from him, which said statements and representations he believed to be true and relied thereon, and were the inducement for the execution and delivery of said notes.

"(5)    That the said plaintiff was the president of the said Carson Manufacturing Company at the time the notes were obtained from the said defendant, and is not a holder in due course.

"(6)    That the ten per cent. attorneys' fee demanded by the said plaintiff is exorbitant and illegal."

In the opinion it is stated:    "If the evidence admissible under the general issue, but not under the grounds of defense, is offered and received without objection, and there is no motion to strike it out, objection to its admissibility is thereby waived, and it may be considered by the jury."

Counsel for the petitioner say,    "We think the record

(pp. 74-75) will satisfy the court that counsel did object both to the questions that brought forth this testimony, and the testimony itself." Turning to the record we find the following:

"Question by Mr. Hiden, counsel for the defendant:

"Please state, Mr. Duncan, how they told you these notes would be handled by this corporation?"

This question was objected to on the following ground: "The notes speak for themselves. They distinctly say 'without offset'; they distinctly state there will be a payment at a bank at a certain time; they are complete in every respect, and to contradict the writing of the signature of E. P. Duncan by mere parol testimony is improper and should not be admitted."

After a running colloquy between Mr. Hiden and the court, the frame of the question was changed, and Mr. Hiden asked:

"What, if anything, did these gentlemen tell you at the time you executed those notes which led you to execute them?

The Court: "That question is alright so far as its form is concerned."

Mr. Sutton: "Would it not be much fairer to both sides to let the question be framed this way: Please state what was the inducement, if any, held out to you to make these notes?

Mr. Hiden thereupon propounded the following question:

"What statements, if any, were made to you by Allen and Seals, which induced you to execute and deliver said notes which are in action?"

Mr. Sutton, counsel for the plaintiff, objects. The court admits the question and exception is noted.

[27] If we look at the two objections noted above by Mr. Sutton, it will be found that the first one was placed on the ground that the parol evidence would contradict

the writing and was, therefore, inadmissible. No objection was made to the evidence on the ground that it was not within the pleadings. Looking at the second objection, no ground is assigned. It is well settled that a general objection to testimony is properly overruled if, the testimony is admissible on any ground. The evidence was admissible, as stated in the opinion, under the general issue, and no valid objection was offered to it.

The subject of the so-called general issue in a proceeding by motion for a judgment, and the procedure thereon, is sufficiently dealt with in the original opinion. It is there also pointed out that the restrictions placed upon the scope of such issue by the statement of the grounds of defense may be waived, and were waived in the case at bar. As the general issue was pleaded, it is unnecessary to pass upon the enlargement of pleadings, by failure to object to evidence not strictly within the issues made by other pleadings. But see *Newberry* v. *Watts,* 116 Va. 730, 82 S. E. 703; *Va. Iron, etc. Co.* v. *Hughes,* 118 Va. 731, 88 S. E. 88.

[28] Coming now to the second error assigned in the petition for rehearing, based upon the construction placed upon section 6365 of the Code. Prior to the enactment of this section of the Code, the law required the appellate court to enter such a judgment as the trial court ought to have entered, and if that rule had been still in force it would have been the duty of the court to have entered judgment for the defendant instead of for the plaintiff. The change of the law, however, required the court to enter such judgment, decree or order as to the appellate court should seem right and proper, which was done in this case. Section 6365 of the Code relates entirely to procedure in the appellate court, and was in force when the opinion in this case was rendered. The case of *Wilson* v. *Hundley,* 96 Va. 96, 30 S. E. 492, has no bearing upon the question here presented.

Counsel for the petitioners are mistaken in supposing that the case of *Mangus* v. *McClelland,* 93 Va. 786, 22 S. E. 364, and other cases of that class, have any bearing upon the question of reinvesting a vendor with title to property. That class of cases relates wholly to sales of real estate. The sale in this case was a sale of personalty, and the judgment for the defendant annulling the sale *ipso facto* reinvested the vendor with the title to the stock. This subject is fully discussed and the authorities on the subject cited in Burks' Pl. & Pr., sec. 239, and what is said in the opinion was merely out of abundant caution and to avoid any misapprehension on the subject. Section 6365 of the Code does not confer any original jurisdiction upon the court and none was exercised by it. Its enactment was clearly within the legislative power.

Other asignments of error in the petition for rehearing need not be noticed as they are either fully dealt with in the opinion or are not within the grounds of demurrer to the evidence assigned by the plaintiff. Section 6117 of the Code requires a party tendering a demurrer to the evidence to state in writing specifically the grounds of demurrer relied on, and provides that no ground of demurrer other than those specifically stated shall be considered.

We have carefully reviewed the record of the case in the light of the petition for rehearing, and see no reason to change the opinion originally delivered.

*Reversed.*